# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 20, 2006        Decided February 13, 2007

No. 05-5447

ISLAMIC AMERICAN RELIEF AGENCY (IARA-USA),
APPELLANT

v.

ALBERTO GONZALES, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE U.S., ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 04cv02264)

———

*Shereef H. Akeel* argued the cause for appellant. With him on the briefs was *John Kenneth Zwerling*.

*Douglas Letter*, Litigation Counsel, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *Peter D. Keisler*, Assistant Attorney General. *Sharon Swingle*, Attorney, entered an appearance.

Before: SENTELLE and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

2

SENTELLE, *Circuit Judge*: The Islamic American Relief Agency ("IARA-USA"), based in Columbia, Missouri, challenges the district court's decision upholding the blocking of its assets. The government concluded that the organization was a branch office of a Specially Designated Global Terrorist and invoked its authority under anti-terrorism laws to block IARA-USA assets. In this appeal, IARA-USA contends that the district court erroneously held that the record supports the government's conclusion, and that it erroneously dismissed and entered summary judgment for defendants on IARA-USA's claims under the Administrative Procedure Act and the Constitution. IARA-USA also argues that it should have been permitted to amend its complaint to request access to its blocked funds for payment of attorneys' fees. Because we conclude that the designation was supported by the record and was not contrary to law, we affirm the district court's disposition of the case, but on the question of attorneys' fees we remand for further proceedings.

## I

In 1985, a Sudanese immigrant founded IARA-USA as the Islamic African Relief Agency. Since then, the entity has engaged in humanitarian activities around the world, often in partnership with similar organizations. In 2000, IARA-USA changed its name from the "Islamic *African* Relief Agency" to the "Islamic *American* Relief Agency" (emphasis added). Meanwhile, the entity in Sudan calling itself the Islamic African Relief Agency ("IARA") continued to exist under that name.

On October 13, 2004, the Office of Foreign Assets Control in the Department of the Treasury ("OFAC") designated IARA as a Specially Designated Global Terrorist ("SDGT"). The designation was based on OFAC's conclusion that IARA "provides financial support or other services to persons who

3

commit, threaten to commit or support terrorism" in violation of anti-terrorism laws. Although IARA-USA was not independently designated, OFAC considered it to be the United States branch of IARA and included it in the blocking notice. This meant that none of IARA-USA's financial assets or property could be "transferred, withdrawn, exported, paid, or otherwise dealt in without prior authorization from OFAC." IARA-USA could not receive "any contribution of funds, goods, or services," nor could it continue to use its offices or remove any items of corporate property. Any violation of the blocking notice could subject IARA-USA to criminal and civil penalties.

IARA-USA immediately contested the blocking, maintaining that it is a separate entity from IARA. It requested that OFAC review the designation and permit IARA-USA to access its blocked funds for the limited purpose of paying attorneys' fees. In late December 2004, having failed to persuade OFAC to unblock its assets, IARA-USA filed a complaint in district court, naming as defendants the Attorney General, the Secretary of the Treasury, and other unidentified FBI agents and Treasury personnel.[1] Relevant to this appeal, it claimed that (1) the blocking is unsupported by the record and thus violates the APA and the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1707; (2) the blocking violates IARA-USA's constitutional rights of equal protection, free exercise of religion, and free association; and (3) IARA-USA should be permitted to pay attorneys' fees from the blocked funds. In a memorandum opinion and order issued on September 15, 2005, the district court dismissed or entered summary judgment in favor of defendant on all claims. *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34 (D.D.C. 2005) ("*IARA-USA*"). The district court held that the

---

[1]For simplicity, we refer to the remaining defendants collectively as "the Government."

4

record supported OFAC's conclusion that IARA-USA was a branch of IARA, and that the blocking was proper under applicable laws and the Constitution. It also denied the motion to access blocked funds for attorneys' fees.

In this appeal, IARA-USA argues that the district court erred in rejecting the three arguments described above, and that it erred in failing to ensure that the Government complied with an internal regulation requiring it to declassify record evidence and in denying discovery before entering summary judgment. IARA-USA does not challenge the district court's ruling on its other claims.

## II

We note at the outset that the designated entity, IARA, is not a party to this case, and IARA-USA does not challenge the evidentiary basis for the designation of its alleged parent. Rather, the question here is whether the record supports OFAC's conclusion that IARA-USA is a branch of IARA. If so, as IARA-USA conceded at oral argument, OFAC's blocking of its assets was a proper consequence of the designation.

We review de novo the district court's entry of summary judgment in favor of the defendants. We will affirm if, viewing all evidence in the light most favorable to IARA-USA, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006). A dispute over a material fact is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 7 (quoting *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005)). Under the same de novo standard, the dismissal of claims under Federal Rule of Civil Procedure 12(b)(6) will be affirmed if "it appears beyond doubt

5

that [IARA-USA] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). We accept the complaint's factual allegations as true and give IARA-USA the benefit of all inferences that can reasonably be drawn therefrom. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). This Court need not, however, accept inferences that are unsupported by the facts set out in the complaint, nor will it accept legal conclusions cast in the form of factual allegations. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Our review of an SDGT designation falls under the APA, and thus its highly deferential standard of review applies. *See Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003). Under that standard, we will set aside OFAC's action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We may not substitute our judgment for OFAC's, but we will require it to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted); *see also Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 507 (D.C. Cir. 2003). Thus, with respect to the APA claims, if OFAC's actions were not arbitrary and capricious and were based on substantial evidence, we must affirm the district court's decision. 5 U.S.C. § 706(2)(A); *Holy Land*, 333 F.3d at 162.

**A**

This case is the first in this Court challenging an SDGT designation based on a branch relationship with an entity that supports terrorists. Our prior cases involved entities that

6

directly supported terrorists.  IARA-USA suggests that because of this factual difference, we should review the blocking as we would review an alias designation in a Foreign Terrorist Organization ("FTO") case.  In those cases, we require evidence that the designated entity "so dominates and controls" the alleged alias entity that they can be considered one and the same.  *Nat'l Council of Resistance of Iran v. Dep't of State*, 373 F.3d 152, 157 (D.C. Cir. 2004) ("*NCRI*").  On IARA-USA's theory, then, blocking its assets based on the designation of IARA was proper only if IARA "dominates and controls" IARA-USA.  The Government disagrees, arguing that the alias test is not applicable here because this blocking was not based on an alias theory.  It urges instead that the blocking may stand if there is sufficient evidence that IARA-USA and IARA are the same organization, even in the absence of evidence that one controls the other.

We conclude that the Government has the better argument. To determine whether the evidence is sufficient, we must employ a test that reflects the theory on which the assets were blocked.  The "dominates and controls" test is appropriate for reviewing the existence of a principal-agent relationship because, where there is sufficient evidence to find an agency relationship, substantial evidence of the principal's unlawful activity is sufficient to justify the designation or blocking of the agent.  *See NCRI*, 373 F.3d at 157 (concluding that the "dominates and controls" test is an appropriate basis for upholding an alias designation, because of the "ordinary principle[] of agency law" that "where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created . . . one may be held liable for the actions of the other") (internal quotation marks and citation omitted).  In this case, however, OFAC's theory was that IARA-USA and IARA, along with other branch offices, comprised a single global organization.  The Government argues that their

7

relationship, therefore, is more accurately described as one between different offices of the same entity. It follows that, if the record contains substantial evidence that IARA-USA is a branch of IARA, then it was proper for OFAC to subject IARA-USA to the blocking as a result of IARA's designation.

The district court applied the proper standard. It entered summary judgment on the APA claims, concluding that the record contained "substantial evidence" to support OFAC's conclusion that IARA-USA "is related and connected to the IARA," and accordingly that the designation was not arbitrary and capricious. *IARA-USA*, 394 F. Supp. 2d at 45-46. As did the district court, we shall limit our review of the designation to the administrative record. *Holy Land*, 333 F.3d at 162.

With this framework in mind, we turn to the unclassified record. While the record contains a great number of documents, we discuss here only a sampling of the most pertinent. IARA-USA was founded by an immigrant from Sudan, the site of IARA's offices, and was incorporated with a name identical to IARA's from its founding until 2000, when IARA-USA made the minor change of replacing "African" in its name with "American." IARA-USA's Articles of Incorporation describe it as "Islamic African Relief Agency United States Affiliate" and include the purpose of "effect[ing] the Objectives and Means of the Islamic African Relief Agency as set forth in its Constitution." In the event of IARA-USA's dissolution, the Articles of Incorporation provided that IARA, among other entities, should receive its assets.

Since its founding, IARA-USA has continued to engage in conduct that evinces a branch relationship with IARA. In 1998, for example, IARA-USA applied to the Treasury Department for a license to transfer funds to "Islamic African Relief Agency, Sudan," in which it described itself as "The Islamic African

8

Relief Agency, United States Affiliate."  It described "the Islamic African Relief Agency, Sudan" as its "partner in Sudan."  In a letter to the *Washington Times* on October 10, 1995, IARA-USA's Executive Director identified himself as speaking on behalf of "IARA and its partners," implicitly accepted the newspaper's characterization of IARA as the "Khartoum-based 'Islamic Relief Agency,'" and acknowledged IARA's "branch offices in the United States" and other countries.  Solicitation materials used by IARA-USA stated that its "international headquarters are in Khartoum, Sudan."  Additionally, IARA-USA maintained financial connections with at least one other IARA branch and its address was listed on IARA websites as a United States branch office.

IARA-USA denies that this evidence reveals a branch relationship.  The initial identity and current similarity in the entities' names, it claims, is purely coincidental: the founder of IARA-USA, though aware of IARA's existence, chose the name because it was descriptive of the organization's mission.  Although IARA-USA offers no explanation for the references to IARA in its Articles of Incorporation, it nonetheless categorically denies that the organization was founded as a branch.

IARA-USA's arguments fail in the face of clear and substantial evidence in the record.  The evidence supports the conclusion that, at its founding, IARA-USA considered itself a branch of IARA.  An entity's "genesis and history" may properly be considered by OFAC in making the designation or blocking, at least where the ties have not been severed.  *Holy Land*, 333 F.3d at 162.  Although it is true that IARA-USA subsequently amended its name, there is no indication that it severed the relationship, particularly in light of the more recent evidence discussed above.  Indeed, since IARA-USA itself does not concede that it was ever a branch of IARA, it cannot argue

9

that the name change effected a severance of the relationship. Rather, IARA-USA would have us believe that the amended name, as the initial name, was chosen simply because it was descriptive, without any intention of aligning with IARA. We need not pass on the credibility of this explanation, however, because we hold that the other evidence in the record is sufficient to support OFAC's interpretation of the evidence.

We acknowledge that the unclassified record evidence is not overwhelming, but we reiterate that our review – in an area at the intersection of national security, foreign policy, and administrative law – is extremely deferential. *Cf. Holy Land*, 333 F.3d at 166 (noting the unique nature of reviewing an SDGT designation as "involving sensitive issues of national security and foreign policy"); *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1137 (9th Cir. 2000) (noting that, where a "regulation involves the conduct of foreign affairs, we owe the executive branch even more latitude than in the domestic context" and stating that the high degree of judicial deference to the decision to designate an entity as an FTO "is a necessary concomitant of the foreign affairs power"). Under that standard, the record – containing various types of evidence from several different sources, and covering an extended period of time – provides substantial evidence for the conclusion that IARA-USA is part of IARA. Furthermore, although we deem it unnecessary to sustain OFAC's actions, the classified record contains extensive evidence that IARA-USA is a branch of IARA.

OFAC's conduct was also lawful under the relevant statute and Executive Orders. In the wake of the attacks of September 11, 2001, the President invoked the authority of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1707 ("IEEPA") by declaring a national emergency with respect to the "unusual and extraordinary threat to national security" posed

10

by terrorists. *Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism*, Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 23, 2001), as amended by Exec. Orders No. 13,268, 67 Fed. Reg. 44,751 (July 2, 2002) and No. 13,372, 70 Fed. Reg. 8499 (Feb. 16, 2005). In that Order, the President described the types of conduct that could subject an entity to blocking of its assets, such as providing financial support to terrorists. He named a number of entities whose assets would be blocked immediately, and authorized the Treasury Department to designate additional entities that it determines are within the purview of the Order. Exec. Order No. 13,224, §§ 1, 7, 66 Fed. Reg. at 49,079, 49,081.

IARA-USA argues that OFAC cannot block an entity's assets unless it determines that the entity itself poses an "unusual and extraordinary threat to national security." The district court rejected this argument, holding that the threat need not be found with regard to each individual entity. *IARA-USA*, 394 F. Supp. 2d at 46. We agree with the district court. The President may exercise his authority under the IEEPA "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). Thus, once the President has declared a national emergency, the IEEPA authorizes the blocking of property to protect against that threat. *Id.* § 1702(a)(1)(B). It is that authority OFAC invoked when it blocked IARA-USA's assets. We hold that the district court correctly dismissed this claim because IARA-USA could prove no set of facts that would entitle it to relief.

11

**B**

We turn next to IARA-USA's claims that the blocking violated its rights under the Constitution.  As an initial matter, we note that IARA-USA's constitutional claims rest on a misinterpretation of OFAC's basis for the designation.  IARA-USA argues that the blocking was unconstitutional because the Government has not shown that IARA-USA is controlled or dominated by IARA.  But as explained above, OFAC's basis for the blocking was that IARA-USA functions as a branch of IARA.  Thus, the "dominates and controls" test is not relevant to whether the blocking was constitutional.  And since we have concluded that there was substantial evidence that IARA-USA was a branch of IARA, these constitutional claims lose their footing.  As we have noted previously, "there is no First Amendment right nor any other constitutional right to support terrorists." *Holy Land*, 333 F.3d at 166; *see also Humanitarian Law Project*, 205 F.3d at 1133 ("[T]here is no constitutional right to facilitate terrorism" with materials or funding.).

Our analysis of IARA-USA's constitutional arguments is informed by our recent decision in *Holy Land*, 333 F.3d at 164-67.  In that case, Holy Land Foundation ("HLF") challenged its designation as an SDGT under the First, Fourth, and Fifth Amendments.  *Id.*  The district court rejected  HLF's First and Fifth Amendment claims, and we affirmed, on the basis that "the law is established that there is no constitutional right to fund terrorism." *Id.* at 165.  Thus, where an organization is found to have supported terrorism, government actions to suspend that support are not unconstitutional.  *Id.* (noting that HLF could not have "produced evidence upon which a reasonable trier of fact could have found that the designation and the blocking of assets violated its First or Fifth Amendment rights" because "there is no constitutional right to fund terrorism" and the record evidence established that HLF did fund a terrorist organization).

12

IARA-USA contends that OFAC violated its right to equal protection under the Fifth Amendment by singling it out as a Muslim organization.  As evidence that OFAC treated it differently than similar organizations, IARA-USA notes that UNICEF's funds were not blocked even though it also provided financial support to IARA.  The district court entered summary judgment after concluding that IARA-USA had not shown that it was similarly situated to UNICEF.  *IARA*, 394 F. Supp. 2d at 50-51.  As the district court noted, to survive summary judgment IARA-USA must show that it was treated differently than a similar organization with similar ties to an SDGT.  *Cf. Plyler v. Doe*, 457 U.S. 202, 216 (1982) ("[T]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940))).  IARA-USA asserts that UNICEF entered into a contract in which it agreed to provide financial support to IARA.  But a single contact of this nature does not begin to approximate the extensive relationship between IARA-USA and IARA.  As the district court held, IARA-USA and UNICEF are not similarly situated, and as a result their disparate treatment by OFAC cannot itself support a claim that IARA-USA has been denied equal protection of the law.  IARA-USA's equal protection claim thus was properly rejected by the district court.

IARA-USA also argues that OFAC violated its rights of association and free exercise of religion under the First Amendment.  Its freedom of association claim is that the blocking inhibits its ability to engage in the associational activity of making financial contributions and that its association, even with an unpopular entity, cannot form the basis of the decision to block its assets.  Following *Holy Land*, the district court dismissed the claim, concluding that the blocking did not implicate IARA-USA's association rights because it did not prevent or punish the associational activity of IARA-USA,

13

but rather was directed at its funding of terrorists, as a branch of IARA. *IARA-USA*, 394 F. Supp. 2d at 54. We agree with the district court. Our decision in *Holy Land* relied on the Ninth Circuit's recent decision in *Humanitarian Law Project*. *Holy Land*, 333 F.3d at 166 (holding, with regard to HLF's freedom of association claim, "that there is no First Amendment right nor any other constitutional right to support terrorists" with funding) (citing *Humanitarian Law Project*, 205 F.3d at 1133). In *Humanitarian Law Project*, entities designated as FTOs argued that preventing them from making donations in support of humanitarian and political activities violated their First Amendment right of association, at least where it was not shown that they intended their donations to support unlawful activities. 205 F.3d at 1133. The Ninth Circuit noted that freedom of association is implicated where people are punished merely for "membership in a group or for espousing its views, whereas the statute in question only prohibited the act of giving material support." *Id.* (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982)). Similarly, it held that the requirement to show intent to aid unlawful acts was not applicable in the context of donations to terrorist groups, because the money could be used for unlawful activities regardless of donor intent. *Id.* at 1133-34.

Here, as in *Holy Land*, we adopt the Ninth Circuit's reasoning. The blocking was not based on, nor does it prohibit, associational activity other than financial support. The blocking of IARA-USA's assets does not punish advocacy of IARA's or any other entity's goals. *See Humanitarian Law Project*, 205 F.3d at 1133-34 (distinguishing financial support from advocacy and noting that, just as "there is no constitutional right to facilitate terrorism by giving terrorists the weapons and explosives with which to carry out their grisly missions," neither is there any "right to provide resources with which terrorists can buy weapons and explosives"). We hold that OFAC's blocking

14

of IARA-USA's assets does not implicate IARA-USA's First Amendment right of association.

Nor is the Government required to show that IARA-USA funded terrorist organizations with an intent to aid their unlawful activities. Although the Supreme Court has previously imposed such an intent requirement, it is limited to cases in which liability was imposed by reason of association alone. *See Healy v. James*, 408 U.S. 169, 186 (1972) (noting that where First Amendment rights are denied based on "guilt by association alone, without (establishing) that an individual's association poses the threat feared by the Government . . . [t]he government has the burden of establishing a knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims") (internal quotation marks and citations omitted). In this case, however, OFAC's decision to block IARA-USA's assets was not based on association. Rather, as we have explained above, the decision was based on OFAC's finding that IARA-USA is a branch of an SDGT. Thus we do not require a showing that IARA-USA intended its funding to support terrorist activities. *Cf. Humanitarian Law Project*, 205 F.3d at 1133-34 ("We therefore do not agree . . . that the First Amendment requires the government to demonstrate a specific intent to aid an organization's illegal activities before attaching liability to the donation of funds.").

As to IARA-USA's free exercise of religion claim, we conclude that the district court properly entered summary judgment for defendants. IARA-USA argues that the blocking "substantially burdens" the religious exercise of its members because they intended their donations to fulfill their religious obligation to engage in humanitarian charitable giving. Blocking those funds before they could be distributed, IARA-USA contends, interfered with that religious expression. As we explained in *Holy Land*, "[a]cting against the funding of

15

terrorism does not violate the free exercise rights protected by . . . the First Amendment. There is no free exercise right to fund terrorists." 333 F.3d at 167. We have already concluded that there was sufficient evidence in the administrative record that IARA-USA did, through its relationship with IARA, support terrorism. We thus affirm the district court's dismissal of IARA-USA's free exercise claim.

IARA-USA argues that, had it been permitted to engage in additional discovery on its constitutional claims, it might have found evidence sufficient to survive summary judgment. The district court held that discovery was not warranted because, based on the record presented, discovery would not have produced any evidence to create a genuine factual dispute and thus could not have changed its disposition of the claims. *IARA-USA*, 394 F. Supp. 2d at 43 n.9. "The district court has broad discretion in its handling of discovery, and its decision to allow or deny discovery is reviewable only for abuse of discretion." *Brune v. IRS*, 861 F.2d 1284, 1288 (D.C. Cir. 1988) (quoting FED. R. CIV. P. 26(b)(1) (internal quotation marks and citation omitted)). The district court's review of the APA claims were limited to the administrative record, but IARA-USA "had ample opportunity" to – and indeed did – come forward with additional evidence during the administrative proceeding to support its other claims. *IARA-USA*, 394 F. Supp. 2d at 43 n. 9. *See Holy Land*, 333 F.3d at 166 (noting that there was an adequate record where the designated entity had "every opportunity and incentive to produce the evidence sufficient to rebut" the evidence supporting the designation in order to create a genuine factual dispute). We thus conclude that the district court did not abuse its discretion in denying discovery.

16

**C**

IARA-USA also argues that the district court erred in failing to ensure that the Government complied with an internal regulation governing the declassification of record material in judicial proceedings. The regulation, promulgated by the Department of Justice, states in relevant part that when that agency is required "to produce classified information" in litigation, it "shall immediately determine from the agency originating the classified information whether the information can be declassified." 28 C.F.R. § 17.17(a)(1). In a hearing in early 2005, the district court accepted DOJ's representation that it had complied with the regulation. Even if it had not, the regulation provides no private right of action, as IARA-USA itself conceded at oral argument before this Court. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 285-86 (2001) (noting, in the context of anti-discrimination legislation, that a regulation does not make actionable conduct that is not prohibited by the statute). We thus find no basis on which we could conclude that the district court erred with respect to the agency's compliance with its internal regulation.

\* \* \*

Finally, IARA-USA maintains that the district court erred in denying its motion to compel payment of attorneys' fees. The blocking notice stated that OFAC would consider "requests for specific licenses to ameliorate the effects" of the blocking, including permitting "the payment from blocked funds . . . of attorneys' fees and expenses related to legal representation of the organization in this matter." In its motion, IARA-USA argued that OFAC acted arbitrarily and capriciously in denying its request to access the blocked funds for the purpose of paying attorneys' fees connected with the litigation. The district court denied the motion, concluding that the motion raised a new

17

claim that was collateral to the complaint and thus that the issue was not properly before the court. *IARA-USA*, 394 F. Supp. 2d at 39 n.4.  On appeal, IARA-USA concedes that the issue was not raised in its complaint, but argues that the district court should have permitted it to amend its complaint.  Indeed, it notes, it requested leave to amend its complaint in its motion to compel attorneys' fees: "If the Court adopts Defendants' argument, then by virtue of this Motion, Plaintiff seeks leave to appeal to amend its Complaint for OFAC's wrongful denial of its attorney fees, in violation of APA."  The district court nowhere addressed the request for leave to amend, though this is hardly surprising as this one sentence was buried in an eight-page motion. *IARA-USA*, 394 F. Supp. 2d at 39 n.4 (denying the motion to compel without reference to its alternative request for leave to amend the complaint).

Leave to amend one's complaint is liberally permitted. FED. R. CIV. P. 15(a) (leave to amend a pleading "shall be freely given when justice so requires"); *Foman v. Davis*, 371 U.S. 178, 182 (1962).  We also note that there is some evidence in the record suggesting that IARA-USA's decision to omit the issue from its complaint and the district court's decision to deny the motion may have been based on communications by OFAC implying that it intended to grant the request.  IARA-USA's request for leave to amend, therefore, should be considered. We express no opinion on how the district court should rule, but we believe it should consider the motion.  We therefore remand on this issue in order to give the district court an opportunity to consider the motion for leave to amend.

### III

As the district court held, the blocking of IARA-USA's assets was not unlawful.  OFAC's determination that IARA-USA functions as a branch of IARA was supported by

18

substantial evidence in the unclassified record, and was proper under the relevant anti-terrorism laws, the APA and the Constitution. Accordingly, IARA-USA's claims are without merit and were properly dismissed or disposed of on summary judgment by the district court. The judgment of the district court is affirmed in all respects except that portion relating to IARA-USA's motion for leave to amend its complaint. On that issue, the case is remanded to the district court for further proceedings.

*So ordered.*